IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN THE MATTER OF THE SEIZURE OF: | ) | **FILED UNDER SEAL** |
| 17 ELECTRONIC ACCOUNTS LOCATED AT | ) | |
| GOOGLE LLC; | ) | Case No. 24-mj-08144-TJJ |
| | ) | |
| 18 ELECTRONIC ACCOUNTS LOCATED AT | ) | |
| AT YAHOO INC; | ) | Case No. 24-mj-08145-TJJ |
| | ) | |
| 2 ELECTRONIC ACCOUNTS LOCATED AT | ) | |
| IONOS INC; | ) | Case No. 24-mj-08146-ADM |
| | ) | |

## AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS

I, Jerad Hall, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly

sworn, depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      This affidavit is made in support of an application for warrants:

    a.   To seize the 17 Google accounts described in **Attachment A** that are stored at

premises owned, maintained, controlled, or operated by **Google LLC**, an internet

service provider headquartered at 1600 Amphitheatre Parkway, Mountain View,

CA 94043.

    b.   To seize the 18 Yahoo accounts described in **Attachment B** that are stored at

premises owned, maintained, controlled, or operated by **Yahoo Inc.**, an internet

service provider headquartered at 770 Broadway, 9th Floor, New York, NY 10003.

    c.   To seize the two IONOS (mail.com) accounts described in **Attachment C** that are

stored at premises owned, maintained, controlled, or operated by **IONOS Inc.**

**(1&1Mail & Media, Inc. (Mail.com))**, an internet service provider headquartered

at Two Logan Square, 100 N. 18th Street, Suite 400, Philadelphia, PA 19103.

2.      I am a Special Agent with the FBI and have been since August of 2010.  I am presently assigned to the FBI Kansas City Division's Cyber Crime Task Force (CCTF).  As a Special Agent with the FBI, I investigate criminal and national security related computer intrusion matters involving botnets, malicious software, the theft of Personally Identifiable Information (PII), and other computer-based fraud.  I conducted national security investigations for the FBI Los Angeles Field Office prior to my arrival at the FBI Kansas City Division in June of 2015.  I have received specialized training in the investigation and enforcement of federal laws associated with criminal and national security related matters.  I have also acquired knowledge and skills regarding Cyber Investigations from on-the-job training, from fellow law enforcement officers, and from previous investigations that I have conducted or have been involved with conducting. Prior to my assignment with the FBI, I worked on national security matters as a Military Intelligence Officer for the United States Army.  My active-duty service began in May of 2006 and concluded in June of 2010 when I departed, at the rank of Captain, to attend the FBI Academy in Quantico, VA.

3.      This affidavit is submitted in support of an application for seizure warrants to seize the accounts listed in **Attachments A through C** (collectively, the "**Target Accounts**").[1]  As set forth below, I respectfully submit that there is probable cause to believe that the **Target Accounts** are property used, or intended to be used, by state-sponsored malicious cyber actors to commit or facilitate violations of 18 U.S.C. § 1030 (Computer Fraud), 18 U.S.C. § 371 (Conspiracy), and 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering) (the "**Subject Offenses**"), and that such property is subject to seizure and forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A),

---

[1] Due to the large number of accounts described in this Affidavit, I have included an index that includes all paragraphs in which each Target Account is listed.

(a)(1)(G)(iii), 982(a)(1), and 1030(i), and 28 U.S.C. § 2461.   The procedure by which the Government will seize the **Target Accounts** is described in **Attachments A through C** and below.

4.     The facts set forth in this affidavit are based on my personal knowledge, the knowledge obtained during my participation in this investigation, the knowledge obtained from other individuals, including other law enforcement personnel, review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience.  This affidavit does not contain all of the information known to me or others in regard to the investigation; however, it contains information establishing probable cause to seize the specific **Target Accounts**.  As more fully described below, the providers are U.S.-based companies that provide services to the public via the internet.

5.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that foreign persons have committed violations of the **Subject Offenses**.  This includes committing computer intrusions by gaining unauthorized access to protected computers, intentionally causing damage, extorting victims, including U.S. victims, to pay ransoms, laundering those ransoms, and then using the laundered proceeds in furtherance of additional malicious cyber activity.  There is probable cause to seize the **Target Accounts** as instrumentalities involved in and used in furtherance of the **Subject Offenses**.

## OVERVIEW OF THE COMPUTER INTRUSION CONSPIRACY

### A.     Ransomware Attack on Kansas Medical Provider

6.     This investigation commenced when officials working on behalf of a healthcare provider located in Chanute, Kansas, within the District of Kansas, advised the FBI that on or around May 4, 2021, the medical provider became the victim of a ransomware attack.  On or

around that day, the Kansas medical provider's employees discovered they could not access

computer files.  Attempts to open files resulted in receipt of an error message stating that the file

format had changed.

7.      The Kansas healthcare provider's employees were unable to access the computer

server used for x-rays and diagnostic imaging; the server used for scanning data; the internal

intranet server; and the sleep lab server.

8.      The Kansas healthcare provider's information technology team assessed the

impact of the incident and determined that at least these four physical servers had been encrypted

using ransomware.  Based on my training and experience, I know that ransomware is a type of

malware that is designed to block access to a computer system until a ransom is paid, generally

through virtual currency.  The Kansas healthcare provider and the FBI determined that the

malware was named "maui.exe" (also referred to as "the Maui ransomware").

9.      The Kansas healthcare provider's information technology team found a ransom

note on one of the affected systems.  The ransom note stated that payment would need to be

made to have the files restored.  The note demanded a payment of 2 bitcoin (also referred to as

"BTC") be sent to an address supplied by the attackers.  If payment was not made within 48

hours, the note stated that the price would double.  Additionally, the ransom note stated, "Our

email address: ReneeAFletcher@protonmail.com."

10.     The FBI confirmed that on May 11, 2021, a payment for 1.66 BTC was made on

the Kansas healthcare provider's behalf to the bitcoin address supplied by the attackers.  The

remainder of the ransom was paid on the Kansas healthcare provider's behalf to the same bitcoin

address on May 17, 2021.  The malicious cyber actors subsequently provided the Kansas

healthcare provider the decryption keys to decrypt and access their systems and files, but only

4

after the four servers used to provide healthcare services had all been inaccessible for over a week.

11.     On August 12, 2021, as part of the investigation into the malicious actors using the Maui ransomware, the FBI obtained records from a virtual currency exchange for the virtual currency exchange's customer accounts, which the bitcoin blockchain showed had received deposits from the address to which the Kansas healthcare provider sent ransom payments on May 11 and 17, 2021.

12.     Based on my training and experience, I know that ransomware actors will often move virtual currency funds from the virtual currency address listed in the ransom note to other addresses, in order to conceal their possession and use of those funds and to avoid anti-money laundering checks. During this investigation, the malicious cyber actors have also communicated in coded language. The facts described in the affidavit in support of the application for a seizure warrant issued as part of this investigation in Case No. 2:22-mj-08087-ADM describe the malicious cyber actors sending ransom proceeds to multiple Binance accounts, establishing probable cause that the Maui ransomware actors violated 18 U.S.C. §§ 1956 (a)(1)(B)(i) and 1956(h).

13.     I, therefore, have probable cause to believe that the financial transactions involving the movement of the bitcoin from the initial bitcoin address to the second, subsequent wallet, which contained proceeds from the computer intrusion against the Kansas medical provider, constitutes a violation of 18 U.S.C. §§ 1956 (a)(1)(B)(i) and 1956(h). These facts are described in greater detail in the affidavit in support of the application for a seizure warrant issued in 22-mj-08087-ADM. That affidavit is hereby incorporated into this affidavit.

14.     That seizure warrant authorized the government to seize approximately $500,000 that was connected to the use of the Maui ransomware to extort U.S. victims, including the medical center located in the District of Kansas.  Following the seizure, the FBI continued to investigate the malicious cyber actors.

15.     In June and July 2024, the government obtained additional seizure warrants in cases 24-mj-08113-ADM and 24-mj-08124-ADM.  These seizures warrants permitted the government to seize virtual currency related to another ransomware victim identified as part of this investigation.

16.     As part of its investigation, the FBI determined that the Maui ransomware was a type of malware that had not been reviewed by the FBI prior to the attack on the Kansas medical center.  Between the initial May 2021 attack and July 2022, the FBI responded to multiple Maui ransomware incidents at other U.S. organizations in the healthcare sector.  The victims of these attacks were also told to pay ransoms in bitcoin.

17.     On July 6, 2022, the FBI, the Cybersecurity and Infrastructure Security Agency, and the Department of Treasury announced that the Maui ransomware was being used by North Korean ("DPRK") state-sponsored cyber actors to target healthcare organizations.  The announcement stated that because those organizations provide services critical to human life and health, they are more willing to pay ransoms.  The state-sponsored actors encrypted electronic medical records, diagnostic services, imaging services, and intranet services in these attacks, which often lasted for prolonged periods of time, according to the announcement.

**B.      The FBI Investigation and Identification of DPRK Malicious Cyber Actors' Tactics, Techniques, and Procedures (TTPs)**

18.     Following the initial report of the ransomware attack on the healthcare provider located in the District of Kansas in May 2021, the FBI analyzed the malicious cyber actors'

tactics, techniques, and procedures ("TTPs"). The FBI also reviewed ransom notes, the blockchain, and other information from victims and victim computer networks as part of its investigation. Additionally, the FBI obtained legal process on numerous email and other online accounts that have been linked to the Maui ransomware campaign. Multiple magistrate judges in this district have signed search warrants seeking the contents of email and other accounts in connection with this investigation pursuant to 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A). Approximately 39 search warrants have been issued during this investigation; a complete list is included in Appendix A.

19.     The following terminology, which has been discussed in other affidavits, is necessary to understand how the FBI has investigated these actors, attributed computer intrusions and money laundering activity to the co-conspirators, and linked the specific accounts to be seized to the illegal activity:

  a.  *Cookies*. Based on my training and experience, I know that providers such as Google and Yahoo use cookies and similar technologies to track users visiting their webpages and using their products and services. Basically, a "cookie" is a small file containing a string of characters that a website places onto a user's computer or device. When that computer visits again, the website will recognize the cookie and identify the same user who visited before. This sort of technology can be used to track users across multiple websites and online services belonging to providers like Google and Yahoo. More sophisticated cookie technology can be used to identify users across devices and web browsers. From my training and experience, I know that cookies and similar technology used by providers such as Google and Yahoo may constitute

evidence of the criminal activity under investigation. By linking various accounts, devices, and online activity to the same user or users, cookies and linked information can help identify who was using a Google or Yahoo account and determine the scope of the criminal activity.

b. *IP addresses*. Every device that connects to the Internet must use an Internet Protocol (IP) address. Because of this, IP address information can help to identify which computers or other devices were used to access a particular account. Providers, including Google and Yahoo, log the IP addresses used to register accounts and the IP addresses users use to login to their accounts.

c. *Recovery email addresses*. Based on my training and experience, I know that a recovery email address is used to regain control of an email address if the user forgets the password. When a user registers an account with Google, Yahoo, or Proton Mail (an email product provided by the Swiss company Proton Technologies AG), they generally provide such a recovery email address. These providers will often verify recovery email addresses by sending a code to the recovery email and having the user enter that code to complete the registration of the recovery email. Therefore, I know that the user of an account generally has access to and control of the recovery email address.

d. *Secondary and alternate email addresses*. Based on my training and experience, I know that email services often allow users to be logged into more than one account at the same time or use other methods to associate multiple accounts. These accounts are often referred to as secondary or alternate email addresses.

8

e.  *Recovery phone numbers.*  Based on my training and experience, I know that providers including Google and Yahoo collect phone numbers for multiple purposes, including to be used for SMS two-factor authentication.  These providers will often verify phone numbers by sending a code and having the user enter it on their browser.  I know from my training and experience that, when multiple accounts share the same recovery phone number, they are generally controlled by the same person.

20.     I know from my training and experience that malicious cyber actors often create large numbers of accounts at email and communications providers, web hosting providers, and cryptocurrency providers, in an attempt to compartmentalize their operations and make it more difficult to trace different intrusions to the same threat actor.  Even so, multiple accounts can often be traced to the same threat actor when, for example, they (1) have been accessed from the same Internet Protocol (IP) address, (2) are used as recovery, secondary, or alternate email addresses, (3) are linked by cookies, (4) use the same phone number, or (5) use the same moniker or username.  In this investigation, the FBI has identified a large number of email addresses associated with the same group of malicious cyber actors.

21.     I know from my training and experience that providers of email services, web hosting services, cryptocurrency exchanges and payment services, and file storage services collect information about their users, such as IP addresses and cookie information, and often require their users to affirmatively provide and verify contact information, such as recovery email addresses and phone numbers.

22.     Some TTPs of these DPRK malicious cyber actors are distinct.  I have learned from the investigation that these actors create large numbers of online accounts, including

accounts that provide encrypted services. These online accounts are often linked by cookie, IP address, recovery, secondary, or alternate email address, or phone number; it is generally much easier to create a new email address than to obtain a new valid phone number or a new device. Throughout the investigation, the FBI identified accounts accessed by IP addresses located in the DPRK.

23.     According to information from victims and exfiltrated data, including data hosted in cloud storage accounts controlled by the malicious cyber actors, these actors have specifically targeted United States and South Korean entities with Maui ransomware. This is consistent with industry reporting. The FBI has concluded that the malicious cyber actors responsible for the Maui ransomware campaign are part of a group known to private sector security researchers as Andariel, Onyx Sleet, Stonefly, and Silent Chollima. Private sector researchers consider Andariel to be a subgroup of Lazarus Group, which is closely tied to the DPRK regime.

24.     The FBI has determined that the use of the Maui ransomware and the laundering of the ransoms is one part of Andariel's operations. According to open-source reporting, ransom payments obtained by Andariel are transferred among various cryptocurrency accounts and ultimately used as a source of income for the DPRK government. Based on the FBI investigation, these malicious cyber actors are working on behalf of the DPRK government's Reconnaissance General Bureau ("RGB").

25.     In addition to this type of ransomware and money laundering activity, private sector security researchers and the FBI have observed this group of malicious cyber actors and the RGB engaging in espionage against key government entities and defense contractors in the United States, South Korea, and other Western countries. Information obtained during this investigation indicates that Andariel has committed ransomware attacks against at least five

U.S.-based healthcare entities and then used the proceeds to finance its espionage operations.

RGB actors have succeeded in these operations, exfiltrating terabytes of data such as research,

plans, intellectual property, and other confidential business and government information from

victims across the world in the pharmaceutical, defense, and technology sectors.  The

government previously served legal process on U.S. providers for DPRK-controlled accounts

that contain exfiltrated victim data.

## **PROBABLE CAUSE**

### *Google Accounts*

26.     On May 4, 2021, the FBI responded to the healthcare provider in the District of

Kansas that was hit by a ransomware attack—an attack later determined to be the first known

Maui attack.  In coordination with the healthcare provider's information technology team, the

FBI learned that the malicious cyber actors provided an email address to negotiate the ransom

with the victim:  ReneeAFletcher@protonmail.com.

27.     The United States made a Mutual Legal Assistance Treaty ("MLAT") request to

Switzerland for Proton Technologies AG records related to the email address

ReneeAFletcher@protonmail.com.  Records received from Proton Technologies AG showed that

the account ReneeAFletcher@protonmail.com was created on June 29, 2019, with the recovery

email address **whas1985@yahoo.com**.

28.     The government obtained an order pursuant to 18 U.S.C. § 2703(d) on

**whas1985@yahoo.com** in November 2021.  In December 2021, January 2022, and April 2022,

search warrants were executed on the account **whas1985@yahoo.com**.  Through these warrants,

the FBI was able to determine that the **whas1985@yahoo.com** account was primarily being used

by a DPRK-sponsored malicious cyber actor to communicate with co-conspirators conducting

malicious cyber activity, including to (1) plan ransomware attacks, and (2) send bitcoin

transaction information in order to launder the extorted funds.

29.     As described in previous search warrant affidavits listed in Appendix A, this

account was associated with numerous additional accounts used by co-conspirators.  For

example, the email account **raajivkum26@gmail.com** sent an email to **whas1985@yahoo.com**.

The government served legal process on Google to identify subscriber records for the account

**raajivkum26@gmail.com**.  This account was identified as being created on May 9, 2019, under

the name Rajiv Kumar.  This account also used a recovery email account of

**tomson.wedner@mail.com** (discussed below).  The FBI obtained a search warrant for Google

account **raajivkum26@gmail.com**.

30.     The government identified one email in the search warrant return, sent from

**raajivkum26@gmail.com** to **whas1985@yahoo.com** on July 4, 2022.  This email had a subject

of "Hi" and contained an encoded string of characters.  The FBI decoded this string and

identified it as a bitcoin address.  The FBI analyzed the bitcoin address and learned that it

received a payment on July 5, 2022 (the day after the message was sent).

31.     The government linked this transaction to proceeds from a ransomware payment

made by a victim located in the District of Connecticut.  The victim is a healthcare company that

provides healthcare policy advocacy for minority groups.  The ransomware attack on this victim

used malware that functioned similarly to Maui ransomware and was called m.exe.

32.     The government previously obtained a search warrant for Google accounts

**songvedembmt1@gmail.com, daviddpedroo999@gmail.com, david.0000.paul@gmail.com,**

**kopasrsele@gmail.com, coinhakohuobi@gmail.com,** and **kasurkurma20feb@gmail.com,**

signed by the Honorable Teresa J. James (22-mj-8250-ADM).  These accounts were linked by

cookies to **raajivkum26@gmail.com**, indicating that the same device was used to access these different Google accounts. The Google search warrant return showed that Google account **busisyhasi@gmail.com** was linked by cookie and recovery email to **daviddpedroo999@gmail.com**. Additionally, the search warrant returns showed that Google accounts **jamie.dornan05@gmail.com** was linked by cookies to **david.0000.paul@gmail.com**.

33.     The government previously obtained a search warrant for Google account **asitdolui6666@gmail.com**. This account was also linked by secondary email to **raajivkum26@gmail.com** and by recovery email to **kopasrsele@gmail.com**. Additionally, both **raajivkum26@gmail.com** and **asitdolui6666@gmail.com** have the same recovery email: **tomson.wedner@mail.com** (discussed below).

34.     The government previously obtained a search warrant for the account **tayronqxhardy07@gmail.com**. In addition to being linked to other Andariel-controlled Google accounts by cookie and to the same IP address as other accounts, **tayronqxhardy07@gmail.com** was also the email address provided by DPRK co-conspirators to a South Korean victim company in March 2023 for ransomware negotiations. **tayronqxhardy07@gmail.com** used the same recovery account as another known Andariel Google account.

35.     Lee Boreas is a known moniker of the DPRK-sponsored cyber actors. The FBI obtained a pen register/trap-and-trace order and search warrant for the account **leeboreas@gmail.com**. The account has been linked to other DPRK accounts in various ways and has communicated with other known malicious DPRK cyber actors, including **whas1985@yahoo.com**. The search warrant return for **leeboreas@gmail.com** indicated that the user of the account has searched for terms related to secure messaging applications and virtual private network (VPN) products. Additionally, an email between **leeboreas@gmail.com** and

**whas1985@yahoo.com** discusses the procurement of a technology product and a "bit-c transaction." From my training and experience, including my experience on this investigation, I interpret "bit-c transaction" as a reference to a bitcoin transaction, which likely relates to these malicious actors' laundering ransom payments.

36.     The government previously obtained search warrants for Google accounts **vkr5731@gmail.com** and **duttapritom78@gmail.com**. A review of the search warrant returns indicates that these accounts both use the same recovery phone number as **whas1985@yahoo.com**. Additionally, **vkr5731@gmail.com** and **duttapritom78@gmail.com**, respectively, use the same phone numbers as **letitiajpoland@yahoo.com** and **jainathmanoj@yahoo.com**. Both **letitiajpoland@yahoo.com** and **jainathmanoj@yahoo.com** are linked by cookies to **whas1985@yahoo.com**. Those Yahoo accounts are both discussed next.

37.     The government previously obtained a pen register/trap-and-trace order for Google account **nirmhanpandiri@gmail.com** (22-cm-80493-HLT-TJJ). The **nirmhanpandiri@gmail.com** account has been associated with Andariel activity related to the Tdrop malware, which is a Microsoft Windows malware family widely attributed by the private sector to North Korea. According to records previously obtained from hosting providers and Yahoo, **nirmhanpandiri@gmail.com** was the recovery email address for a Yahoo email address used to register command-and-control servers used in Andariel's Tdrop attacks. The Andariel actors created a large number of Yahoo accounts, possibly as an obfuscation tactic. This Google account, **nirmhanpandiri@gmail.com**, is also linked by cookie to another known Andariel account, indicating that it is likely controlled by the same Andariel actor.

38.     An Andariel victim company received a ransom note from email address sanjgold847@protonmail.com.  The government requested and received records from Proton Technologies AG, which showed that the account sanjgold847@protonmail.com has a recovery email of **nicolas6999999@gmail.com**.

39.     The government previously obtained a search warrant for Google account **reneefletcher1988@gmail.com**.  This account uses a similar moniker to the email provided to the victim in the first Maui ransomware attack, ReneeAFletcher@protonmail.com.  Furthermore, the search warrant return indicated that **whas1985@yahoo.com** was the recovery email for **reneefletcher1988@gmail.com**.  It also showed that a similarly named account, **reneeafletcher@mail.com** (discussed below), was in the contact list of **reneefletcher1988@gmail.com**.  Additionally, the search warrant return also contained emails received from blockchain.com and Shodan, a type of search engine that can scan the internet for vulnerable internet-connected devices.

*Yahoo Accounts*

40.     As set forth in other affidavits and above, **whas1985@yahoo.com** is directly tied to the first Maui ransomware attack on the Kansas healthcare provider.  The malicious cyber actors provided email address ReneeAFletcher@protonmail.com to the victim.  As part of the investigation, the United States requested records related to ReneeAFletcher@protonmail.com. Records from Proton Technologies AG showed that the account was created on June 29, 2019, with the recovery email address **whas1985@yahoo.com**.  The government previously obtained multiple search warrants for **whas1985@yahoo.com** and determined it is one of the primary accounts used by the malicious cyber actors to conduct ransomware and espionage operations.

15

41.     As a result of those warrants, the government learned that the malicious cyber

actor who controlled **whas1985@yahoo.com** received multiple emails from

**wj0705@yahoo.com**.  The government obtained multiple search warrants on

**wj0705@yahoo.com**, which is believed to be used by a co-conspirator.  The FBI reviewed

emails, including emails between both of these accounts, and determined the co-conspirators in

many cases used coded messages.  The government also obtained a pen register/trap-and-trace

order on **wj0705@yahoo.com** in 2022.

42.     As a result of legal process, the FBI learned that **rajusandhipeta@yahoo.com** is

linked by cookies to **whas1985@yahoo.com**.

43.     The government previously sought and received a search warrant for Yahoo

account **rajeshchatarghi@yahoo.com**.  This was the recovery account for

gregorykcortes@protonmail.com, which was used to send a ransom note to a foreign Maui

ransomware victim.  Additionally, **rajeshchatarghi@yahoo.com** used a recovery phone number

known by the FBI to be controlled by DPRK malicious cyber actors.

44.     That same DPRK-controlled phone number was also used as a recovery phone

number for the accounts **murthyvenu@yahoo.com** and **rudhraduppatla@yahoo.com**, which

are both believed to be controlled by the same DPRK malicious cyber actor.

45.     The government previously obtained a search warrant for Yahoo account

**jeevanmannepu@yahoo.com**.  This email address was linked to the Maui ransomware actors

and an attack on a Colorado medical provider through cryptocurrency tracing, Binance records,

and records from Proton Technologies AG.  The malicious file in that attack was named

"aui.exe."

46.     The FBI previously sought and received search warrants for the contents of the Yahoo accounts **kiranvanasathi@yahoo.com**, **letitiajpoland@yahoo.com**, **jainathmanoj@yahoo.com**, and **ramsethul@yahoo.com**.  All four of these accounts were linked by cookies to **whas1985@yahoo.com**.

47.     The government previously obtained search warrants for the contents of the Yahoo accounts **vardhan_girish@yahoo.com**, **kiranvaghi@yahoo.com**, **nandhankorada@yahoo.com**, **karthivalasa@yahoo.com**, **raginishraina@yahoo.com**, **pranithkanakala@yahoo.com**, and **shivanghjain@yahoo.com**.  All of these accounts use the same recovery phone number as **kiranvanasathi@yahoo.com**, which is linked by cookie to **whas1985@yahoo.com**.

### IONOS (mail.com) Accounts

48.     Upon reviewing search warrant results for **whas1985@yahoo.com**, the FBI discovered that email address **reneeafletcher@mail.com** was in the contact list.  This account uses the same moniker, "Renee A. Fletcher," that was used in the protonmail.com email address left in the May 2021 ransom note to the Kansas victim.

49.     The government previously sought and obtained a warrant for IONOS account **tomson.wedner@mail.com** (22-mj-8209-TJJ).  As previously discussed, both **raajivkum26@gmail.com** and **asitdolui6666@gmail.com** use the recovery account **tomson.wedner@mail.com**.

### Probable Cause

50.     I have probable cause to believe that the **Target Accounts** constitute "property, real or personal, involved in a transaction or attempted transaction in violation of section 1956

. . . or any property traceable to such property" and are therefore subject to seizure under 18 U.S.C. § 981(a)(1)(A).

51.     Additionally, under 18 U.S.C. § 981(a)(1)(G), the **Target Accounts** are assets "derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism (as defined in section 2332b(g)(5)) against the United States, citizens or residents of the United States, or their property." These accounts were involved in, used, or intended to be used to commit ransomware attacks on hospitals by the North Korean Reconnaissance General Bureau, in violation of 18 U.S.C. §§ 2332b(g)(5) and 1030(a)(5)(A) and (c)(4)(A)(i)(II). Those attacked were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5)(A), and they caused "the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals," 18 U.S.C. § 1030(c)(4)(A)(i)(II), when they encrypted computers belonging the healthcare facilities within the United States.

52.     Therefore, I have probable cause to believe that the **Target Accounts** listed in **Attachments A through C** are subject to seizure by and forfeiture to the United States.

## BACKGROUND ON THE PROVIDERS[2]

53.     Google LLC, Yahoo Inc., and IONOS Inc. ("the email providers") are United States companies that offer to the public a variety of online services, including email, which can be accessed through a web browser or mobile applications. The email providers also offer additional products. For example, Google offers a free web browser called Google Chrome, a

---

[2] The information in this section is based on information published by the providers on their public websites, as well as information made available to registered law enforcement by the providers.

free search engine called Google Search, a free video streaming site called YouTube, a free

mapping service called Google Maps, and a free traffic tracking service called Waze. Many of

these free services offer additional functionality if the user signs into their Google Account.

54.     Signing up for an account with the email providers generates an email address at

the domain gmail.com (Google), yahoo.com (Yahoo), or mail.com (IONOS). That email address

will be the log-in username for access to the email account.

55.     The email providers keep certain records indicating ownership and usage of the

account across services, described further after the description of services below.

56.     The email providers all maintain the following records and information with

respect to subscriber accounts:

        a.      *Email contents.*  In general, any email (which can include attachments

such as documents, images, and videos) sent to or from a subscriber's account, or stored in draft

form in the account, is maintained on an email provider's servers unless and until the subscriber

deletes the email. If the subscriber does not delete the email, it can remain on the computers of

the email providers indefinitely. Even if the subscriber deletes the email, it may continue to be

available on an email provider's servers for a certain period of time.

        b.      *Address book.*  The email providers allow subscribers to maintain the

equivalent of an address book, comprising email addresses and other contact information of other

email users.

        c.      *Subscriber information.*  The email providers collect and maintain

(typically unverified) identifying information about each subscriber, including, for example,

name, username, address, telephone number, and secondary, alternate, or recovery email

addresses. They also maintain records concerning the date on which the account was created, the

19

Internet protocol ("IP") address of the user at the time of account creation, the current status of the account (e.g., active or closed), the length of service, and the types of services utilized by the subscriber.

d. *Device Information.* The email providers collect and maintain information identifying devices (including both computers and mobile devices) used to access accounts, including some or all of the following: a device serial number, a GUID or Global Unique Identifier, a phone number, MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Android ID, Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI").

e. *Cookie Data.* The email providers use features to track the activity of users of their accounts, including whether or not the user of an account accesses other accounts at the same provider using the same computer, or accesses accounts maintained by other providers while logged into an account. One of the ways they do that is by using cookies, described above, which are strings of characters stored on the user's computer or web browser that are recognized by the email providers when a computer visits their sites or logs into an account.

f. *Transactional information.* The email providers also typically retain certain transactional information about the use of each account on their systems. This information can include records of login (i.e., session) times and durations and the methods used to connect to the account (such as logging into the account through the email providers'

websites).  The email providers also generally retain information regarding accounts registered from the same IP address.

        g.    *Preserved and backup records.*  The email providers also maintain preserved copies of the foregoing categories of records with respect to an account, for at least 90 days, upon receiving a preservation request from the Government pursuant to 18 U.S.C. § 2703(f).  The email providers may also maintain backup copies of the foregoing categories of records pursuant to its own data retention policy.

57.    In addition, the email providers generally maintain records with respect to other services, which they store in connection with subscriber accounts.

## STATUTORY AUTHORITY

58.    This Court has jurisdiction to issue the requested seizure warrants pursuant to 18 U.S.C. § 981(b)(3) and 28 U.S.C. § 1355(b).  Specifically, the Court is located in a "district in which any of the acts or omissions giving rise to the forfeiture occurred." 28 U.S.C. § 1355(b)(1)(A).

59.    Title 18, U.S.C. § 981(a)(1)(A) provides, in relevant part, that any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 is subject to civil forfeiture to the United States.  Title 18, United States Code, Section 982(a)(1) provides, in relevant part, that any property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 is subject to criminal forfeiture to the United States government.

60.    Title 18, U.S.C. § 1030(i) provides, in relevant part, that any personal property used or intended to be used to commit or to facilitate the commission of a violation of 18 U.S.C. § 1030 is subject to criminal forfeiture to the United States.

61.    Title 18, U.S.C. § 981(a)(1)(G)(iii) provides, in relevant part, that all assets used or

intended to be used to commit any Federal crime of terrorism (as defined in 18 U.S.C. § 2332b(g)(5)(B), which includes violations of 18 U.S.C. § 1030), against the United States, citizens or residents of the United States, or their property are subject to civil forfeiture to the United States, and subject to criminal forfeiture pursuant to 28 U.S.C. § 2461.

62.     Title 18, United States Code, Section 982(b)(1) authorizes the issuance of a criminal seizure warrant under Title 21, United States Code, Section 853(f), which provides in relevant part that a seizure warrant for property subject to forfeiture may be sought in the same manner in which a search warrant may be issued.  A court shall issue a criminal seizure warrant if it determines that the property to be seized would, in the event of a conviction, be subject to forfeiture and that a restraining order would be inadequate to assure the availability of the property for forfeiture.

63.     Title 18, U.S.C. § 981(b) authorizes seizure of property subject to civil forfeiture based upon a warrant supported by probable cause.  Title 18, U.S.C. § 981(b)(3) permits the issuance of a seizure warrant by a judicial officer in any district in which a forfeiture action against the property may be filed and may be executed in any district in which the property is found.

64.     Seizure accomplished by locking users out of the **Target Accounts** is further necessary because there is no other reasonably practicable way to preserve the forfeitable property contained in the account at this time.  Neither a restraining order nor an injunction is sufficient to guarantee the availability of the **Target Accounts** for forfeiture.  By seizing the **Target Accounts**, the Government will prevent any third parties from accessing or manipulating the forfeitable property in the **Target Accounts** or using them to commit additional crimes.

65.     There is probable cause to believe that the **Target Accounts** are subject to civil and criminal forfeiture because they were used or intended to be used to commit or to facilitate the

commission of violations of 18 U.S.C. §§ 371, 1030, and 1956, and as such are forfeitable to the United State pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(G), 982(a)(1), and 1030(i). Specifically, the **Target Accounts** were involved in and enabled the North Korean state-sponsored malicious cyber activity, including ransomware attacks on and extortion of U.S. healthcare providers and subsequent money laundering of the ransoms.

## SEIZURE PROCEDURE

66.     All three providers allow subscribers to obtain an account by registering for an account on their websites.  During the registration process, subscribers generally select an individualized username, or use their email address as a username, and create a password to access the account.  Access to the account can also be shared by multiple users who know the account username and password.  However, all three providers have the ability to suspend user access to an account, thereby "locking" that account and preventing user access to and manipulation of the contents of the account.  The three providers can accomplish this without destruction or deletion of the account or its data, while preserving the ability to access the account at a later time.

67.     As detailed in **Attachments A through C**, upon execution of the seizure warrant, the providers shall be directed to restrain and lock the relevant **Target Accounts** pending transfer of all right, title, and interest in the forfeitable property to the United States upon completion of forfeiture proceedings, to ensure that access to or manipulation of the forfeitable property cannot be made absent court order or, if forfeited to the United States, without prior consultation by the United States.

## CONCLUSION

68.     For the foregoing reasons, I submit that there is probable cause to believe that the **Target Accounts** have been used in and/or intended to be used in facilitating and/or committing

the **Subject Offenses**. Specifically, probable cause exists to believe that the **Target Accounts** have been used as instrumentalities to commit the **Subject Offenses** by North Korean state-sponsored cyber actors against U.S. victims, including medical providers. Accordingly, the **Target Accounts** are subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (a)(1)(G), 18 U.S.C. § 982(a), and 28 U.S.C. § 2461 and I respectfully request that the Court issue a seizure warrant for the **Target Accounts**.

69.    Because the warrant will be served on all three providers, which control the **Target Accounts**, and the providers, thereafter, at a time convenient to them, will lock the **Target Accounts** under their possession, custody, or control, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

70.    Finally, and in order to protect the ongoing investigation and in consideration that much of the information set forth above is not otherwise publicly available, I respectfully request that this Affidavit be filed and kept under seal until further order of this Court.

Jerad Hall
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this day __24th__ of July, 2024.

HONORABLE RACHEL E. SCHWARTZ
UNITED STATES MAGISTRATE JUDGE

## INDEX

| | |
|---|---|
| raajivkum26@gmail.com | ¶ 29, 30, 32, 33, 49 |
| songvedembmt1@gmail.com | ¶ 32 |
| daviddpedroo999@gmail.com | ¶ 32 |
| david.0000.paul@gmail.com | ¶ 32 |
| kopasrsele@gmail.com | ¶ 32, 33 |
| coinhakohuobi@gmail.com | ¶ 32 |
| kasurkurma20feb@gmail.com | ¶ 32 |
| busisyhasi@gmail.com | ¶ 32 |
| jamie.dornan05@gmail.com | ¶ 32 |
| asitdolui6666@gmail.com | ¶ 33, 49 |
| tayronqxhardy07@gmail.com | ¶ 34 |
| leeboreas@gmail.com | ¶ 35 |
| vkr5731@gmail.com | ¶ 36 |
| duttapritom78@gmail.com | ¶ 36 |
| nirmhanpandiri@gmail.com | ¶ 37 |
| nicolas6999999@gmail.com | ¶ 38 |
| reneefletcher1988@gmail.com | ¶ 39 |
| whas1985@yahoo.com | ¶ 27, 28, 29, 30, 35, 36, 39, 40, 41, 42, 46, 47, 48 |
| wj0705@yahoo.com | ¶ 41 |
| rajusandhipeta@yahoo.com | ¶ 42 |
| rajeshchatarghi@yahoo.com | ¶ 43 |
| murthyvenu@yahoo.com | ¶ 44 |
| rudhraduppatla@yahoo.com | ¶ 44 |
| jeevanmannepu@yahoo.com | ¶ 45 |
| kiranvanasathi@yahoo.com | ¶ 46, 47 |
| letitiajpoland@yahoo.com | ¶ 36, 46 |
| jainathmanoj@yahoo.com | ¶ 36, 46 |
| ramsethul@yahoo.com | ¶ 46 |
| vardhan_girish@yahoo.com | ¶ 47 |
| kiranvaghi@yahoo.com | ¶ 47 |
| nandhankorada@yahoo.com | ¶ 47 |
| karthivalasa@yahoo.com | ¶ 47 |
| raginishraina@yahoo.com | ¶ 47 |
| pranithkanakala@yahoo.com | ¶ 47 |
| shivanghjain@yahoo.com | ¶ 47 |
| reneeafletcher@mail.com | ¶ 39, 48 |
| tomson.wedner@mail.com | ¶ 29, 33, 49 |

## ATTACHMENT A

### I.      Seizure Procedure

A.      The seizure warrant will be transmitted electronically to personnel of the provider listed in Section II ("**Subject Provider**") who is directed to make any changes necessary to restrain and lock the **Target Accounts** pending transfer of all rights, title, and interest in the **Target Accounts** to the United States upon completion of forfeiture proceedings.

B.      Upon seizure of the **Target Accounts**, the **Subject Provider** shall take all steps necessary to restrain and lock the account to ensure that access to or manipulation of the forfeitable property cannot be made absent a court order or, if forfeited to the United States government, without prior consultation with the United States.

C.      The **Subject Provider** shall disable all access to the **Target Accounts** except as necessary for the **Subject Provider** to comply with any additional legal process or engage in normal business operations.

### II.     Subject Provider

Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043

### III.    Target Accounts

raajivkum26@gmail.com
songvedembmt1@gmail.com
daviddpedroo999@gmail.com
david.0000.paul@gmail.com
kopasrsele@gmail.com
coinhakohuobi@gmail.com
kasurkurma20feb@gmail.com
busisyhasi@gmail.com
jamie.dornan05@gmail.com
asitdolui6666@gmail.com
tayronqxhardy07@gmail.com
leeboreas@gmail.com
vkr5731@gmail.com
duttapritom78@gmail.com
nirmhanpandiri@gmail.com
nicolas6999999@gmail.com
reneefletcher1988@gmail.com

## ATTACHMENT B

### I.     Seizure Procedure

A.     The seizure warrant will be transmitted electronically to personnel of the provider listed in Section II ("**Subject Provider**") who is directed to make any changes necessary to restrain and lock the **Target Accounts** pending transfer of all rights, title, and interest in the **Target Accounts** to the United States upon completion of forfeiture proceedings.

B.     Upon seizure of the **Target Accounts**, the **Subject Provider** shall take all steps necessary to restrain and lock the account to ensure that access to or manipulation of the forfeitable property cannot be made absent a court order or, if forfeited to the United States government, without prior consultation with the United States.

C.     The **Subject Provider** shall disable all access to the **Target Accounts** except as necessary for the **Subject Provider** to comply with any additional legal process or engage in normal business operations.

### II.     Subject Provider

Yahoo Inc., 770 Broadway, 9th Floor, New York, NY 10003

### III.     Target Accounts

whas1985@yahoo.com
wj0705@yahoo.com
rajusandhipeta@yahoo.com
rajeshchatarghi@yahoo.com
murthyvenu@yahoo.com
rudhraduppatla@yahoo.com
jeevanmannepu@yahoo.com
kiranvanasathi@yahoo.com
letitiajpoland@yahoo.com
jainathmanoj@yahoo.com
ramsethul@yahoo.com
vardhan_girish@yahoo.com
kiranvaghi@yahoo.com
nandhankorada@yahoo.com
karthivalasa@yahoo.com
raginishraina@yahoo.com
pranithkanakala@yahoo.com
shivanghjain@yahoo.com

## ATTACHMENT C

### I.     Seizure Procedure

A.      The seizure warrant will be transmitted electronically to personnel of the provider listed in Section II ("**Subject Provider**") who is directed to make any changes necessary to restrain and lock the **Target Accounts** pending transfer of all rights, title, and interest in the **Target Accounts** to the United States upon completion of forfeiture proceedings.

B.      Upon seizure of the **Target Accounts**, the **Subject Provider** shall take all steps necessary to restrain and lock the account to ensure that access to or manipulation of the forfeitable property cannot be made absent a court order or, if forfeited to the United States government, without prior consultation with the United States.

C.      The **Subject Provider** shall disable all access to the **Target Accounts** except as necessary for the **Subject Provider** to comply with any additional legal process or engage in normal business operations.

### II.     Subject Provider

IONOS Inc. (1&1Mail & Media, Inc. (Mail.com)), Two Logan Square, 100 N. 18th Street, Suite 400, Philadelphia, PA 19103

### III.     Target Accounts

reneeafletcher@mail.com
tomson.wedner@mail.com

## APPENDIX A: LIST OF WARRANTS ISSUED IN THIS INVESTIGATION TO DATE

Seizure Warrants

22-mj-08087-ADM

24-mj-08113-ADM

24-mj-08124-ADM

Search Warrants

21-mj-08180-TJJ

21-mj-08258-JPO

21-mj-08262-JPO

21-mj-08263-JPO

21-mj-08269-TJJ

22-mj-08005-TJJ

22-mj-08011-TJJ

22-mj-08012-JPO

22-mj-08035-TJ

22-mj-08036-TJJ

22-mj-08041-TJJ

22-mj-08042-TJJ

22-mj-08057-TJJ

22-mj-08062-TJJ

22-mj-08066-TJJ

22-mj-08070-TJJ

22-mj-08089-ADM

22-mj-08090-TJJ

22-mj-08091-TJJ

22-mj-08092-TJJ

22-mj-08093-ADM

22-mj-08098-ADM

22-mj-08150-ADM

22-mj-08177-TJJ

22-mj-08209-TJJ

22-mj-08210-TJJ

22-mj-08211-TJJ

22-mj-08249-TJJ

22-mj-08250-ADM

22-mj-08251-ADM

22-mj-08252-TJJ

22-mj-08253-TJJ

22-mj-08257-ADM

22-mj-08258-TJJ

23-mj-08035-TJJ

23-mj-08043-TJJ

23-mj-08052-TJJ

23-mj-08054-TJJ

23-mj-08055-TJJ